Filed 10/23/14  P. v. Graves CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056634 |
| v. | (Super.Ct.No. SICVPT 10-51078) |
| MICHAEL DAVID GRAVES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Inyo County.  Roger T. Picquet, Judge. (Retired judge of the San Luis Obispo Super.Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Laurel M. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and Linh Lam, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found that defendant, Michael Graves, was a sexually violent predator within the meaning of Welfare and Institutions Code section 6600-6604. The trial court committed defendant to the Department of Mental Health for an indeterminate term. Defendant appeals from the judgment, contending that insufficient evidence supports the verdict, certain evidentiary rulings were in error, his motion for a new trial should have been granted and the Sexually Violent Predator Act violates equal protection. We reject his contentions and affirm.

## FACTS

A forensic psychologist who testified for the prosecution opined that past behavior is a good predictor of future behavior and thus considered the fact that defendant had been charged with multiple sex crimes involving three victims, i.e., his niece, with whom or near whom he lived, and the daughters of two of his live-in girlfriends and he had been charged with animal cruelty for having sex with a dog. As part of a plea bargain, defendant pled guilty to one count of committing lewd and lascivious acts on a minor and two counts of sexual battery, all three based on his acts with the daughter of one of his live-in girlfriends—the lewd and lascivious conviction comprised the predicate offense in the Sexually Violent Predator proceedings against defendant. The crimes against this victim were committed over a period of four to five months during 1997 and 1998, while she was 10 or 11 years old. According to this victim, defendant digitally penetrated her on five occasions, while she was sleeping. During the same period, defendant was having sex with the victim's mother. Before 1999, defendant molested his three- to five-

2

year old niece, she said, on 100 occasions. Her vagina was penetrated with his penis and his fingers, her chest was rubbed and defendant had her masturbate and orally copulate him. Doctors said she was afraid of defendant because he had hurt her butt, and a medical examination revealed injuries to her hymen and anus consistent with molestation and sodomy, although she gave conflicting stories about the latter. On one occasion, she had blood between her legs, which she originally attributed to a bike accident, then to defendant. Between July and December 1998, defendant molested the daughter of another live-in girlfriend when the girl was seven years old. He fondled her genitals on more than 20 occasions, had her touch his penis on about 17 occasions, had her masturbate him, touched her genitals with his penis and used sex toys on her genitals and butt. This victim said that defendant touched inside her vagina. During an interview with the forensic psychologist in 2010, defendant said of his molestations of his niece and the victim of the predicate act that, "It just happened, basic fondling, I guess." The forensic psychologist also considered that defendant had been convicted of multiple counts of possessing narcotics, possessing methamphetamine for sale, grand theft of a firearm, receiving stolen property, being an ex-felon in possession of a firearm and burglary. A probation report stated that in 1988, defendant beat a child with a coat hanger. Defendant stated that he spanked or hit this child with a belt. Defendant incurred six minor violations of the rules while in prison following his conviction for the offenses against the victim of the predicate crime. The forensic psychologist diagnosed defendant with currently having the mental disorders of pedophilia, antisocial personality disorder

3

and alcohol and amphetamine dependency. He further found that defendant currently had a serious impairment in both his emotional capacity and his volitional capacity. He opined that these disorders predisposed defendant to commit criminal sexual acts in the future. He conceded that the weak point in his analysis was whether defendant had had a conduct disorder before the age of 15, but the mother of defendant's niece, defendant's sister, supplied information to him about defendant's childhood. He was aided in this determination by his administration of four different tests to determine the likelihood that defendant would reoffend in the future—the Static 99, the Static-2002R, the Psychopathy Checklist and the Structured Risk Assessment-Forensic Version. Given defendant's criminal history, the forensic psychologist's interview with defendant and the testing, the latter concluded that there was a substantial danger and serious and well-founded risk that defendant would commit future sexual offenses. Having concluded the offenses defendant committed on two of his three victims were predatory (he did not consider the offenses with defendant's niece to be predatory due to the nature of her relationship with defendant) he opined that defendant was likely to commit predatory offenses in the future. The forensic psychologist explained why it was not likely that when defendant was out in the community, he would correct his deviant ways. He testified that his opinion would not change even if defendant had had regular exposure to two of his other nieces around the time of the crimes involving the three victims and had not molested the former.

4

A consulting psychologist testified for the prosecution that defendant currently suffered from pedophilia, polysubstance abuse and anti-social personality disorder. He also opined that defendant was volitionally impaired and was callous. The information he relied on about defendant's crimes with the three victims mostly mirrored that of the prosecution's forensic psychologist. When the consulting psychologist interviewed defendant, the latter denied having any memory of the molestations, but when pressed with details, allowed that it was possible that he committed some of them, but was intoxicated at the time. Defendant denied molesting the last mentioned of the three victims, saying someone else had molested her. As to the victim of the predicate offense, he said, "It was just some fondling, I guess, and stuff like that," but it happened only one time. The consulting psychologist was aware that defendant had also picked up three girls: an 11-year-old, a 13-year-old and a 15-year-old, gave them alcohol and was found passed out in the back seat of his car with one of them while another one was driving it. The consulting psychologist considered that defendant had committed drug related crimes, burglaries, possessions of stolen property, mail fraud, inflicting injury on a child when he severely beat the child with a coat hanger before he committed the molestations, that he stole items from close friends and sold them, and threatened a child over a minor incident about throwing a ball. The consulting psychologist administered the Static 99-Revised, Static 2002-Revised and MN-SOST tests. He concluded that defendant victimized his two non-familial victims soon after he began relationships with their mothers and defendant had a minimal relationship with his sister, the mother of the niece

5

he victimized, therefore he had engaged in predatory offenses with all three victims. The consulting psychologist concluded that because of his mental disorders, there was a substantial danger and serious and well-founded risk that defendant would engage in future sex offenses and defendant fit the definition of a Sexually Violent Predator.

Defendant's two non-familial victims, now adults, testified as to the acts defendant had committed on them.

Other facts, including two videos, will be discussed in connection with the issues, below.

## ISSUES AND DISCUSSION

1. *Insufficiency of the Evidence*

As the jury was instructed, the People had to prove "beyond a reasonable doubt that . . . [¶] [defendant] has been convicted of committing a sexually violent offense against one or more victims[,] [¶] [h]e has a diagnosed mental disorder[,] and [¶] [a]s a result of that diagnosed mental disorder, he is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior. [¶] . . . [¶] . . . [T]he jury is not required to unanimously agree as to which condition or conditions are applicable. [¶] . . . [¶] The likelihood that [defendant] will engage in [sexually violent predatory criminal behavior] does not have to be greater than 50 percent. [¶] Sexually violent criminal behavior is *predatory* if it is directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or a person with whom a relationship has been established or promoted for the primary

6

purpose of victimization.  [¶]  . . .  [¶]  You may not conclude that [defendant] is a sexually violent predator based solely on his alleged prior conviction without additional evidence that he currently has such a diagnosed mental disorder."[1]

In what would better serve as argument to the jury below, defendant here contends that there was insufficient evidence to support the jury's implied findings as required by the above-quoted instruction.  He begins with the established fact that during his 12 year, four month prison stay, he was not detected engaging in any conduct that supported the prosecution's experts' finding that he *currently* suffered from pedophilia.  However, the prosecution's forensic psychologist testified that defendant's mental disorders were life-long conditions, not known to go away and not easily treated.  He observed that defendant had no access to children while in prison, only the most severe transgressions of the prohibition in prison on child pornography would have been prosecuted, there are major disincentives in prison for possessing child porn and more benign interaction with material related to children, like seeing children's pictures in newspapers and magazines and on television, go unpunished.  The prosecution's consulting psychologist likewise testified that there is no cure for pedophilia and defendant had no access to children while

_____

[1] We pause here to express our regret that the trial court acted on the stipulation of counsel, which is missing from the record, that only a portion of the printed instructions needed to be and actually were read to the jury at the end of trial, especially in light of the trial court's accepting another stipulation by counsel (the record shows only defense counsel acceding to this stipulation) that the court reporter did not have to take down the court's reading of the instructions that were actually given.  This leaves us and every other appellate court that reviews this case in the untenable position of not knowing what instructions were actually read to the jury at the close of trial.

in prison.  Defendant received no treatment for either sexual misconduct or substance abuse while in prison, felt he needed none and, during the interview conducted for these proceedings, continued to deny that he needed treatment.

The prosecution's forensic psychologist acknowledged that an author had concluded that the pedophilia urge developed by puberty, and he agreed that there were no reported acts of it by defendant until the latter was 34 years old, however, his research showed that there was a range of time during which pedophiles begin molesting and he opined that defendant inhibited his urge.  When asked if he knew what percentage of pedophiles manifest their urges at what period in their lives, the forensic psychologist replied, "I'm more concerned with [defendant] having acted on [his urge, his] pattern of acting on it, frequency, level of violence.  Since I use risk-relevant factors, that itself, [the] age of onset in pedophilia, isn't in my scheme.  I don't know of it having been determined as a risk-relevant factor, so, no, I didn't include that."  The prosecution's consulting psychologist testified that in more cases than not, the pedophilic urge probably develops around adolescence, however, pedophiles may not act on that urge and he hypothesized why defendant may not have been caught in such acts until he was 34 years old.  As expected, the opinion of the defense experts—that the fact that defendant was not caught molesting children until he was 34 showed that he was not a pedophile—conflicted with this.  Contrary to defendant's current assertion, this did not mean that the jury was not entitled to accept the prosecution's experts' explanations and reject the defense's.

Defendant launches the same type of criticism of the prosecution experts' opinion that defendant currently posed a danger of reoffending, in light of the fact that he did not reoffend while in prison. It would serve no useful purpose here to recount the lengthy testimony of these two experts about why they reached their conclusions, nor the lengthy testimony of the defense experts as to why they reached contrary conclusions. As we have already observed, this argument is more appropriate to trial, not appeal. Suffice it to say that both sides did a thorough job of exploring the reasons for and limitations of the competing opinions of both sides and the jury chose to credit the prosecution's opinions more than the defense's.

Next, defendant claims there was insufficient evidence to prove that as a result of his diagnosed mental disorder, it is likely that he will engage in sexually violent predatory criminal behavior. Starting with the premise that past behavior is the best predictor of future behavior, and/or that the event-free years defendant spent in prison did not meant that his pedophilia had abated, both prosecution experts testified that defendant had engaged in predatory behavior in the past. The forensic psychologist allowed that while defendant's acts with his niece might have demonstrated just very poor judgment, his acts with the victim of the predicate offenses were "quite likely predatory" because he knew that he had already engaged in this kind of conduct and should have known to stay away. He concluded that defendant's relationship with this victim was established in order for defendant to victimize the child. Later, he changed his testimony to state that he viewed defendant's acts with the victim of the predicate offense and with the other victim

9

who was not his niece as predatory. He testified that he based his conclusion about the former on his comparison of the dates stated in a law enforcement report of the beginning of the acts and the onset of the relationship between defendant and the mother of this later victim, although he allowed he did not know "for certain" when the relationship between the two adults began. As to the other victim, who was not defendant's niece, the forensic psychologist testified that he relied on reports that her mother began her live-in relationship with defendant in August of 1998 and the charging documents alleged that the molestations occurred between July and December 1998, before they began cohabiting. He concluded that the relationship between defendant and the child was casual and/or was established by defendant in order to molest the child.

The prosecution's consulting psychologist testified that because defendant said he had a very limited relationship with the mother of his niece, he considered the acts defendant committed on her as predatory. As to the other two victims, he said that defendant began molesting them soon after establishing relationships with their mothers, and while he could not conclude that defendant began his relationship with them in order to molest them, his relationship with them was casual.

We do not agree with defendant that these opinions were based on speculation or were "contrary to established rules." The forensic psychologist stated the source of the factual basis for his opinion and defense counsel below produced nothing in the records upon which the former relied to contradict this. The consulting psychologist was never asked the factual basis for his opinion, but since he appeared to have reviewed the same

10

documents the forensic psychologist did, it is reasonably inferable that he relied on them in reaching his conclusion. As far as "the established rules" go, *the jury instructions*[2] that required *either* that defendant established the relationship *with the victim* (a point defense counsel below appeared to forget) for the purpose of molesting her or that *their* relationship (defendant's and the victim's, not defendant's and the mother—see prior comment) was casual. We are well aware that the defense experts offered contrary opinions. This does not mean that there was insufficient evidence to support the jury's implied finding that it was likely that defendant would engage in sexually violent predatory criminal behavior.

Next, defendant attacks the evidentiary underpinnings of the jury's implied finding that he lacked volitional capacity. The prosecution's forensic psychologist testified that this meant that most people in a particular situation would have controlled their behavior or that the person acted with a degree of callousness. He found the fact that defendant

---

[2] Defendant refers to the forensic psychologist's testimony in answer to the question whether he would consider predatory an act committed by someone who moved into the home of the victim the same day. The doctor responded that "one actuarial instrument" defines an acquaintance of less than 24 hours to be a stranger and if the relationship does not include nurturing or caring for or calling the perpetrator a stepfather or the like, it is casual even if the molestation does not begin at the start of the dating relationship between the parent and the defendant. Defendant misconstrues this testimony as requiring that defendant and these victims know each other for 24 hours or less at the time of the first molestation. It does not. Moreover, even if the actuarial instrument's definition had been applied, these relationships were casual as there was *no evidence* that defendant nurtured or cared for these girls or that they treated him like a stepfather. More importantly, the jury was governed by the instructions, not what some actuarial instrument said.

11

repeated his molesting behavior over and over, including the number of acts and three different victims at different times and circumstances, then later, during an interview with him, tried to minimize it, suggested that the molestations were a pattern for which defendant was out of control.[3] Defendant presents no logical argument or authority why this testimony was insufficient. We are well aware of the fact, as was this expert, that defendant was apparently able to control his behavior while in prison. This did not render the opinion unworthy of belief.

The prosecution's consulting psychologist testified that while defendant expressed to him some sense of guilt for what he had done, he continued the molestations for a number of years, knowing that it was wrong and that he could be punished for it. As defendant points out, the consulting psychologist later acknowledged that defendant was apparently able to control himself in prison, but, of course, he had no access to children there. As with the prosecution's other expert, we detect no fatal flaw in his testimony. The fact that both defense experts testified otherwise is also insufficient to undermine this testimony, which, obviously, was believed by the jury.

We cannot agree with defendant that the evidence supporting the jury's implied findings was infected with legal error. As we state elsewhere in this opinion, the jury was presented with two conflicting views—one that defendant's pre-incarceration behavior, combined with his current minimalization of it and belief that he needed no treatment,

---

[3] Defendant completely misconstrues the doctor's testimony, confusing volitional impairment with emotional incapacity, notions the doctor kept quite separate.

12

demonstrated that he was at the time of trial a sexually violent predator—and one that said the past behaviors were irrelevant, as they were motivated by defendant's addiction to methamphetamine and the fact that defendant did not reoffend while in prison showed that he was not currently a sexually violent predator. The jury chose the former. A defendant's past crimes may serve as the basis for an expert's diagnosis of a current mental disorder and opinion that the defendant is unable to control his sexually violent behavior. (*Kansas v. Hendricks* (1997) 521 U.S. 346, 371 [117 S.Ct. 2072]; *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1145, 1163, 1164.) Logic dictates that defendant's current minimalization of his past conduct and belief that he is not in need of treatment for sexual misconduct or drugs and never has been supports a finding that he continued to pose a substantial danger of repeating that conduct once released into the community.

2. *Evidentiary Rulings*

     a. *Admission of a Portion of the Masturbation Video and Two Stills from the Dog Video*[4]

While defendant was being investigated for the crimes involving the three victims in 1999, the grandmother of one of the victims gave the police two videos which defendant had made. One video (hereinafter "the masturbation video") showed defendant, inter alia,[5] masturbating to pictures of a nude young girl,[6] then to pictures of "adult women pornography[,]" then back to the pictures of the girl, and using sex toys that were consistent with the sex toys one of the victims claimed defendant had used during his encounters with her. When viewing the pictures of the girl, defendant

---

[4] By failing to identify the Exhibit numbers of these items or to refer to them as such in her briefs, appellate counsel for defendant may think that she has escaped her obligation to have asked for early transmission of these exhibits to this court, as stated in our letter of September 28, 2012, but she has not. Counsel should have referred to these items as exhibits and requested early transmission of them to this court, as is her duty. Her failure to do so has delayed this case. How counsel expects this court to decide that these exhibits were unduly prejudicial without this court actually seeing them is beyond us.

[5] Defendant engaged in other sexual activities on this video, which various witnesses testified to but because the present issue deals only with admission of that portion of the video depicting defendant masturbating to the picture of the young girl, we need not mention the other acts.

[6] The prosecution's consulting psychologist testified, outside the presence of the jury, that while some of the reports stated that this child was eight years old, he was of the opinion that she was much younger, perhaps four or five, and only those actually viewing the video could reach a conclusion about her age.

14

commented, "Look at that baby pussy." The other video depicted defendant having sex with a dog (hereinafter, "the dog video") that belonging to the grandmother of one of his victims (the same person who turned the videos over to the police).

Before trial began, defendant anticipated that prosecution and defense witnesses alike would testify to the contents of both of these videos "as a basis for the expert's [*sic*] opinions, but also as substantive proof of the acts themselves[,]" and he voiced no opposition to this, however, he argued that admission of the videos, themselves, was more prejudicial than probative and cumulative of the former, and on those bases, he sought exclusion of the videos. The prosecutor made clear as to the masturbation video that he wanted to introduce only that portion showing defendant masturbating to the pictures of the young girl. The trial court tentatively ruled that this portion of the masturbation video could be shown, but not the dog video. The court reasoned that the former was relevant to whether defendant had a severe mental disorder and the likelihood that he would re-offend. The court reserved the right to have an Evidence Code section 402 hearing with either one or both of the prosecution's experts concerning admissibility of the videos.

Thereafter, the prosecution's forensic psychologist testified about both videos, including descriptions of their contents. He was shown the pictures of the young girl defendant had used in the masturbation video and these pictures were introduced into evidence without objection by the defense. The prosecution's forensic psychologist testified that he had not viewed the dog video before writing the two reports he authored

15

about defendant, but he had read other reports indicating that defendant had had sex with a dog. He explained that he was unable to make the additional diagnosis of bestiality at the time he wrote his reports because there was no evidence that defendant had engaged in that type of behavior for over six months, however, upon viewing the dog video shortly before trial, although he was still unable to make that diagnosis, "there was more substantiation for it, just given the familiarity and comfort [defendant] had with the dog and the ease [with] which he handled it. . . . [I]t was as if he had done it before. . . . [I]t does substantiate there's a potential paraphilia or other paraphilias in there[,]" which made the doctor more confident in the conclusions he had already reached about defendant. As to the masturbation video, the prosecution's forensic psychologist testified that the sex toys defendant used on himself in it were consistent with the ones one of his three victims described defendant had used during his encounters with her and defendant used pornography during this video, consistent with this victim's report that defendant had used pornography while with her. Although the forensic psychologist had not seen this video before writing his reports, he had reviewed documents that described its contents. He testified that the video was undeniable proof that defendant had sexual fantasies about young girls, which helped establish that he suffered from the mental disorder of pedophilia. He also testified that one indicator of sexual recidivism is sexual preoccupation, which the video showed. Additionally, he said that defendant's use of sex toys, pornography and his engaging in self-sodomy on the video indicated sexual preoccupation, which is a predictor of sexual recidivism.

16

Before the prosecution's consulting psychologist testified, the trial court held a Evidence Code section 402 hearing, during which defendant conceded that the expert should be allowed to talk about both videos, including descriptions of their contents, and the portion of the masturbation video showing the young girl was admissible, but not the dog video. The consulting psychologist went on to testify during the hearing that after he had concluded that defendant suffered from pedophilia, polysubstance dependency and antisocial personality disorder, he saw the dog video. Based on it, he believed that this was not the first time defendant had had sex with a dog and watching the video demonstrated this better than reading reports about its contents. He concluded, based on viewing the video, that there was a greater likelihood that defendant suffered from zoophilia. He opined that a person with multiple paraphelias (pedophilia and zoophilia) has an increased risk of re-offending. As to the masturbation video, he testified that viewing it made the level of defendant's deviancy much more apparent and the fact that in it, defendant went from the pictures of the young girl to the adult female and back to the young girl, demonstrated the strength of his pedophilic interest. He said that both videos strengthened his conclusion that defendant would reoffend. The trial court ruled that a portion of the masturbation video sought by the prosecutor to be admitted was relevant for all purposes and "particularly those expressed by the [consulting psychologist]. It goes to a specific paraphelia that he's been diagnosed with. It shows a focus, . . . zooming in on the girl's genitalia, starting his activity with that picture and ending the activity with that . . . ." While finding that the dog video "certainly might

17

reinforce some aspect of [the consulting psychologist's] testimony[, and] [¶] . . . [¶]

 . . . is a piece of evidence the doctor has looked at and has used to form his opinion as to the likelihood of recidivism or the issue of risk and danger," the trial court agreed with defendant that it was more prejudicial than probative, and denied admission of it, but ruled that the consulting psychologist could testify about it, including a description of its content, to the extent this testimony explained his opinions.  The court left open the possibility of admitting still photographs taken from the dog video.  Without any further discussion that appears on the record before us, and without objection by the defense, during the consulting psychologist's testimony, the prosecutor showed him two still pictures taken from the dog video, after the doctor testified that as part of the plea bargain defendant entered involving the three victims, a charge against defendant for animal cruelty, based on him having sex with the dog, had been dismissed.  This also followed the doctor's description of the contents of the dog video.  These still pictures were admitted into evidence.  The doctor went on to testify that he had asked defendant about the dog video, but defendant claimed he had no memory of it until he was shown the video.  Like the prosecution's forensic psychologist, because he did not have evidence that defendant engaged in sex with an animal or had fantasies and urges to do so over a six month period, he was unable to definitely diagnose defendant additionally with zoophilia, but viewing the dog video made the doctor strongly suspect that defendant also suffered from it.

18

As to the masturbation video, after the consulting psychologist described the contents of that portion of it involving the young girl, that portion was played for the jury. He went on to testify that the video showed that aside from the acts defendant committed with the three victims, the former had additional thoughts, urges and sexual fantasies involving pre-pubescent girls and the video "substantiat[ed] . . . the strength of my ability to make a pedophilia diagnosis." "[I]t added to the weight of my . . . decision. I felt that it strengthened my concerns with respect to his risk for–" at which point, defense counsel interrupted the expert. The consulting psychologist testified that the fact that the video showed defendant also masturbating to an adult female showed that despite the presence of "age-appropriate adult pornography" defendant still had a drive and arousal to pre-pubescent children. The fact that defendant moved from the pictures of the young girl, to the adult and back to the young girl "show[ed] the level of arousal . . . he has towards children, . . . the level of deviancy . . . [¶] . . . of his pedophilia" and "substantiat[ed] the diagnosis that there are clearly thoughts, feelings, urges, and arousal to pre-pubescent children." He based his conclusion that defendant was a pedophile in part on the video. He also testified that in other portions of this video, defendant used sex toys on himself that were similar to the ones one of his victims described defendant using on her.

Just as defense counsel had predicted, his experts also testified about both videos, including descriptions of the contents of those videos.

As is clear from the foregoing, defendant objected below only to both videos being shown to the jury. He was successful as to the dog video. He *never* objected to the stills

19

from the dog video being shown, therefore, he waived his current claim that they should not have been admitted. (Evid. Code, § 353.) However, we will set aside his waiver of the issue and address his contentions, because it is arguable that his original objection on the bases that the videos were more prejudicial than probative and that they were cumulative "carried over" to the stills from the dog video.

First, defendant asserts that his actions with the dog, which occurred, at the latest, in 1999, had no relevancy to whether he currently had a diagnosed mental disorder which caused him to pose a substantial risk of committing a violent predatory offense if released. Defendant cites no authority holding that a defendant's past acts are irrelevant to his current mental state and the likelihood at the present time of him re-offending, especially when, as here, he has been in prison for the entire interim.[7] As we stated before, the authority is to the contrary. In light of the amount of time that was spent at this trial by defense counsel over whether defendant's acts with the three victims were predatory in nature and his solicitation of his clinical psychologist's opinion that she doubted that all the allegations made by the three victims was true and her listing of reasons why two of the three were untruthful, defendant's current position is at odds with his trial strategy. If whether defendant's conduct with them in 1999 was predatory or was

_____

[7] Taking defendant's position to its logical conclusion, no defendant, no matter how heinous his pre-prison conduct, who managed to behave himself while in prison, could qualify as a Sexually Violent Predator based on opinions that find guidance to any significant degree on that conduct. Surely this could not be the intention of the Sexually Violent Predator Act.

20

not, and whether all the acts they claimed he perpetrated on them actually occurred were relevant, by parity of reason, defendant's conduct on the dog video (as well as the masturbation video) was equally relevant despite when it occurred. Moreover, defendant's overarching position was that whatever behavior defendant engaged in before he went to prison did not make him *currently* a sexually violent predator. The People's position was just the opposite and it was for the jurors to accept one position and reject the other. They accepted the prosecution's and we are in no position to say otherwise.

Next, defendant asserts that because both experts testified that viewing the dog video did not *change* their conclusions about defendant, the still photos were irrelevant. Not so. At the Evidence Code section 402 hearing, the consulting psychologist explained how viewing the dog video *strengthened* his conclusions. While appearing to agree with this, the trial court felt that the video was just too prejudicial and excluded it. However, the consulting psychologist's testimony, both during the Evidence Code section 402 hearing and at trial, as well as the testimony of the prosecution's forensic psychologist at trial to the same effect, demonstrated that if defendant had actually objected to the admission of the two photos, the trial court would not have abused its discretion in admitting them. (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) This same testimony also undermines defendant's assertion that the still photos were cumulative of other evidence admitted. We find defendant's reliance on criminal cases holding that evidence of a defendant's past bad acts should be sparingly admitted inappropriate in a case such as this where defendant's past acts are just about all the prosecution experts felt they had

21

to go on in rendering the opinions necessary to assist the jury in its verdict. (See *People v. Fulcher* (2006) 136 Cal.App.4th 41, 55 [Fourth Dist., Div. Two], ["Due process under the SVP Act 'is not measured by the rights accorded a defendant in criminal proceedings, but by the standard applicable to civil proceedings."].)

We also, having viewed the still photos,[8] conclude that they were not substantially more prejudicial than the many descriptions of the entire video offered by various witnesses during trial. Defendant simply cannot demonstrate that he was prejudiced by these two pictures sufficiently to overturn the jury's verdict in light of all the other references that were made to the content of the video at trial.

Despite initially asserting here that admission of the portion of the masturbation video was error, defendant fails to specifically address in his opening brief how it constituted an abuse of discretion.[9] Other than the extent to which any of the arguments he made about the still photos from the dog video are applicable to the portion of the masturbation video shown, we reject them, for the reasons already stated.

---

[8] Frankly, they are far more clinical than graphic.

[9] In his reply brief, defendant uses the same argument he advanced about the dog video still photos and adds a new one not even mentioned below, i.e., that admission of the portion of the masturbation video was misleading because it failed to show him performing all the sexual acts that did not involve young girls. However, descriptions of all these acts were given to the jury by the experts (see fn. 5, *ante*, p. 14) so it was completely aware that defendant engaged in sex acts on the video that did not involve young girls.

22

b. *Testimony of Two of Defendant's Three Victims*

In his trial brief, the prosecutor sought admission below of the testimony of defendant's two non-familial victims, including the one who was the victim of the predicate crime. In his motion in limine, defendant responded by conceding that this testimony was both relevant and admissible, although, he asserted that its prejudicial impact outweighed its probative value. At the hearing on this, however, defendant abandoned this argument and conceded that the People had the right to have these two victims testify. Ignoring this, defendant here contends that the trial court erred in admitting their testimony, but he has waived the matter by his concession at the hearing. (Evid. Code, § 353.)

c. *Defendant's Two Other Nieces Opinions About the Reputation of Defendant's Victimized Niece for Honesty*

Two of defendant's nieces, aged 31 and 30 at the time of trial, testified that although they were about the same age as the three victims when they lived with and interacted with defendant in circumstances similar to those of his three victims, defendant never did or tried to do anything sexually inappropriate with them or their friends. Before they testified, defense counsel said he also wanted them to testify about the reputation defendant's victimized niece, who did not testify at trial, had for honesty at the time defendant's crimes were investigated in 1999, because both prosecution experts relied in part on the statements she had made to the police during that investigation in reaching their conclusions about defendant. We need not get into the merits of this

argument, as we conclude that it is not reasonably probable that defendant would have enjoyed a different outcome had this testimony been admitted. (*People v. Richardson* (2008) 43 Cal.4th 959, 1001.)[10] This is despite the fact that the prosecution's forensic psychologist depended, in part, on the nature and quantity of defendant's acts with his niece, as alleged by her, in concluding that defendant suffered from a current mental disorder, and the prosecution's consulting psychologist depended, in part, on the same, in concluding that defendant had a current mental disorder and posed a serious risk of re-offending.

During cross-examination of both prosecution experts, defense counsel solicited from them the fact that defendant's victimized niece had made contradictory statements during the 1999 investigation about one of the acts she claimed defendant performed on her. The defense's clinical psychologist testified that because this niece's mother (defendant's older sister)[11] had "really said very, very negative horrible things," presumably about defendant, she contacted defendant's younger sister, who told her that the mother had a bad reputation for honesty and credibility—that she was "insane . . . and

---

[10] Because defendant here cites no authority supporting his position that it is a violation of due process to prevent a witnesses from testifying about the reputation of a non-testifying person for honesty, we will address this issue only as it was raised below, i.e., as strictly an evidentiary ruling, subject to the rules concerning the admission of evidence.

[11] The clinical psychologist also testified that defendant and his younger sister had reported to her that the mother of the niece and a cousin were responsible for defendant using drugs.

mentally ill because she makes up stories and convinces herself that they're true." Given the tender age of the niece at the time she reported the acts with defendant, the inference would have been easy for the jury to make that her mother influenced her to say what she did about defendant. Moreover, the clinical psychologist went on to testify that defendant's younger sister told her that the niece and her mother had lived with the younger sister around the time the niece was five years old, and, later, while the niece was in high school, and the younger sister had questioned the niece about the allegations involving defendant, the niece said she did not even know who defendant was and the younger sister did not believe that any molestation had occurred. On the other hand, defendant admitted to the prosecution's forensic psychologist that he fondled this niece,[12] so one has to question the effect of opinion testimony by either of defendant's other nieces to the effect that the niece had a reputation for dishonesty, i.e., was she being dishonest about defendant molesting her at all, or was she being dishonest about particular acts she claimed defendant committed on her or the number of acts he committed on her? Moreover, defendant's other nieces were teenagers at the time, so the value of their opinion is not the same as a mature adult's, which the defense was able to get in through the younger sister's statement to the defense clinical psychologist about the niece's mother. Defendant made no offer of proof as to how either of these witnesses

---

[12] When interviewed by the prosecution's consulting psychologist, defendant said he was unable to recall molesting her, but "[a]nything [was] possible."

might be aware of the reputation of the five year old niece for veracity, so it is pure speculation that their opinions would have been admissible, in any event. Finally, the defense's clinical psychologist testified that there were things about the niece's statements about what defendant had done to her "that troubled [her,]" she "had a little bit of trouble" with the medical reports about what appeared on the niece to be evidence of sodomy, and she had some doubts about whether all the allegations as to all three victims were true. Given the foregoing, we cannot conclude that exclusion of this evidence significantly prejudiced defendant.[13]

      d. *Prosecutor Leading Prosecution Witnesses and Confining Defense Witnesses to "Yes" or "No" Answers*

Defendant correctly points out that on several occasions, the prosecutor asked the prosecution's consulting psychologist leading questions. Unless defendant can demonstrate that the witness would not have testified to these matters without prodding by the prosecutor, we cannot conclude that defendant was prejudiced by this.

As to the prosecutor's directing the defense's clinical psychologist to answer his questions with a yes or no, that's what redirect examination is for—to allow the witness to explain what she was unable to explain on cross-examination. We disagree with defendant's characterization of this as an abrogation by the trial court of its control of proceedings.

---

[13] In his reply brief, defendant appears to assert that the evidence he sought to admit below was an inconsistent statement by defendant's victimized niece. It was not.

26

3. *Motion for a New Trial*

Before she left for the courthouse on June 12, 2012, which was the day the last prosecution witness testified and the People rested their case-in-chief, a juror who subsequently became the foreperson posted to her Facebook page, "7th day of jury duty today . . . argh . . . peace be with me!"  The foreperson testified at the hearing on the motion for a new trial that she believed this post was an acceptable way of telling people that she was on jury duty.  A woman the foreperson testified was someone she helped raise responded to the posting, "GUILTY."  The foreperson repeatedly testified that she did not read this, or any of the other responses she received to her posting, until she was contacted by defense counsel,[14] long after she had been released from duty following the jury's verdict, and consequently, these responses had not influenced her.  She also repeatedly denied talking to this responder, or to anyone else, about the trial until after it was over.  She said she had no idea why this responder said, "Guilty."

At 7:00 a.m. on June 14, 2011, the day after deliberations began and the day the verdict was rendered, the foreperson posted to her Facebook page, "Day 9 of jury duty today . . . peace be with me . . . this is one of the toughest things I've EVER done[.]"  She testified that she posted this without looking at the responses she had received to her June

---

[14] In an investigative report attached to the People's Opposition to Defendant's Motion for a New Trial, a California Department of Justice Special Agent reported that on July 5, 2012, the foreperson "expressed concern that she did not even know what others had posted in response to her postings and told me that she was going to look at her Facebook page. . . .  [¶]  Shortly after our conversation, [the foreperson] called me back and told me that she had reviewed [the responses to] her Facebook postings."

posting. She also testified that she felt her posting was a proper way to tell people that she was on jury duty. A friend of the foreperson's daughter responded, referencing the trial as an "ordeal." The foreperson denied discussing the case with her. The foreperson's daughter responded, "Almost done . . . " The foreperson testified that her daughter lived with her and the foreperson must have told her daughter that she thought the trial was almost over. A childhood friend of the foreperson's responded to the posting, in pertinent part, "[O]nly one more day . . . and you['re] done[. W]e'll take up a collection for you to have therapy when you['re] done with this horrid experience . . . ." The foreperson testified that she communicated with this person only via Facebook and she had no idea how this person would know that the foreperson had only one day left to serve and that the experience was "horrid." A male friend the foreperson testified she had not seen in 25 years responded, "Indict the bastard for making [yo]u waste [yo]ur time. Or vote for death!" The foreperson testified that she had no idea how this man knew that the person involved in the case should be indicted or be given the death penalty or that she was sitting on a criminal case, none of which, of course, was accurate. The woman the foreperson testified she had helped raise responded, " . . . the DB[15] will get

---

**15** The foreperson testified that she did not know what the reference to "DB" meant. Defendant below and here makes much of the fact that the foreperson later referred to defendant as a "douche bag," asserting that this responder's use of the initials "DB" also meant douche bag and suggested that the foreperson had discussed the case with this responder. Although the foreperson testified she did not recall if she used the term "douche bag" in the presence of this person, the fact that she used it in her posting suggests that she had and it is not surprising that a woman she helped raise might have picked it up from her, assuming the latter's use of "DB" meant "douche bag." If it did

*[footnote continued on next page]*

what's coming to him one way or another!"[16]  The foreperson testified that she had no

idea how this woman would know to say that.  As already stated, the foreperson said she

did not read any response to any of her postings until after her jury duty had been

completed and she did not discuss the case with anyone.

On June 15, 2012, the day after the verdict had been rendered, the foreperson

posted to her Facebook page, "Jury duty over—douche bag committed for life ([by the

way "]douche bag["] is too good a term for this guy)—much struggle with ignorant

jurors, but we succeeded.  . . .  [T]he images in my brain may be there awhile."[17]  The

judge who heard the new trial motion, who was the same judge who presided at trial,

noted that at some point during voir dire, defense counsel had said in the presence of the

_____

*[footnote continued from previous page]*
not, as the People assert in their brief (saying it could mean "dirt bag"), defendant's
argument is even less convincing.

**16**  Defense counsel below asked the foreperson how this woman would know
"that some douche bag needs to be found guilty" and the foreperson responded that she
did not know.  However, the responder made no reference to the subject of the case being
found guilty—just that he should get what was coming to him.

**17**  Defendant here calls our attention to three responses to this posting about
which the foreperson was not asked during the hearing on the new trial motion, so she
had no opportunity to explain who these responders were, what they might have meant by
what they said or how they gained the information they appeared to have.  We will not
engage in speculation as to any of these matters, except to note that one of them referred
to "seeing the bad guys getting convicted[,]"thus betraying her ignorance, not her
knowledge, of the case.  (See text at page 29.)  Another referenced the foreperson's
"comments[,]"which could have easily constituted the statements the foreperson had
made in her posting for that day about the now-concluded trial, rather than any other and
improper communication.

jury that defendant could be sent away for life.[18]  The foreperson testified that she

understood from the instructions that a life term was possible and that after the trial, the

prosecutor had told the jurors that the typical term in such cases was life.  The foreperson

also testified that her reference to "ignorant jurors" did not mean that she had already

made a decision about defendant and wanted to convince the other jurors to vote with her.

A former co-worker, whom, the foreperson testified, was still in communication with

many of the foreperson's co-workers, responded to the foreperson's posting on this date,

"Couldn't imagine a better foreman than you . . . ."  The foreperson testified that she was

back at work by the time the former co-worker posted her response, and she had told her

fellow employees that she had been the foreperson.[19]  She testified that she decided the

case only on the evidence that had been presented in the courtroom and the jury

instructions.  She said she followed the instruction that she keep an open mind during the

trial and not make up her mind until after discussing it with other jurors during

deliberations.  She also said that only people she "friended" could read her Facebook

postings, and she had not "friended" any of her fellow jurors and none of them had

---

[18]  Indeed, both the court below and the prosecutor put on the record that such a reference had been made, despite the trial court's ruling that the duration of defendant's commitment, should he be found to be a sexually violent predator, not be mentioned.

[19]  Although defendant here correctly reports that the foreperson testified that she had no idea how the former co-worker knew that she was the foreperson, she also testified that she was back at work and had told her fellow employees that she had been the foreperson before her former co-worker responded to her posting, testimony which defendant now chooses to ignore.

30

mentioned her Facebook postings to her. Finally, she said that she did not get emails alerting her to the fact that people had responded to her Facebook postings.

The judge who heard the motion for new trial was the same judge who first became aware of the foreperson's Facebook postings and the responses to it, and had turned the information over to both trial counsel. He also personally and closely questioned the foreperson while she was on the stand and some of her responses to his questions appear in our reiteration of her testimony. He began his ruling by noting that he was concerned when he saw the postings and responses. Nevertheless, the court concluded that, based on the timing of the responses, it was believable that the foreperson did not look at the responses while serving on the jury. The court further found that the foreperson telling people on June 12 and 14 that she was on jury duty did not constitute misconduct, however, some of her comments soliciting prayers and saying that service was tough "start[ed] getting closer to going over the edge[,]" although the court made no finding of misconduct regarding them.[20] The court found the foreperson's testimony to not be untruthful or not incredible and the court believed her statements that she did not review the responses to her postings and that she decided the case on the evidence and argument presented at trial. The court noted as to the latter that it might feel differently if the defense had produced any of the responders and they had testified otherwise.

---

[20] We note that defendant cites no authority holding that such comments constitute misconduct.

31

We are bound by the trial court's credibility determinations and findings of historical facts if they are supported by substantial evidence. (*People v. Nesler* (1997) 16 Cal.4th 561, 582.) Defendant here contends that the foreperson's denials that she had communicated with the woman whom she helped raise were "incredible" and it was "pretty clear" from the evidence that the foreperson had, indeed, communicated with her. However, "[w]e may not substitute our reading of the 'cold transcript' in this case for the credibility determinations reached by the trial court after making its inquiry, observing the juror, and listening to h[er] responses." (*People v. Stanley* (2006) 39 Cal.4th 913, 951.) Defendant also asserts that the foreperson's postings and the responses indicated that the foreperson had discussed the case with this woman, the man the foreperson had not seen in 25 years and her childhood friend. We disagree. The references by the woman whom the foreperson helped raise and the man she had not seen in 25 years indicate how little either knew about the case—which had nothing whatsoever to do with guilt, being indicted or receiving the death penalty, as the court below had instructed the jury during voir dire and before trial began. As for the foreperson's childhood friend referring to the jury experience as horrid and the foreperson's daughter's friend referring to it as "an ordeal," after two postings from the foreperson asking for prayers and saying, on June 14, that serving on the jury was "one of the toughest things [she'd] ever done,"[21]

---

[21] This is precisely the explanation offered by the foreperson when she was asked about her daughter's friend's comment.

the comments are not surprising and they do not suggest communication between the foreperson and either woman. Moreover, defendant ignores the fact, noted by the trial court, that all of these people may well have had the benefit of reading each other's responses to the foreperson before formulating their own.[22] As to the foreperson's childhood friend knowing that the foreperson had only one more day of service left, the foreperson admitted that she must have told her daughter that the trial was near the end. The defense presented no evidence that there was no communication between the daughter and this friend about when the foreperson's service would end, and, given the tone of the friend's response, it was evidence that the friend was very concerned about

---

[22] For example, one of the responses on June 12 was "For sure the case you[']r[e] on is not a car accident or a workman[']s comp[ensation] case" and another was "GUILTY[!]" These preceded the responses on June 14 about indicting the "bastard," voting for death, or "the DB" getting what's coming to him. We note that defense counsel failed to question the foreperson below about a response made to her June 14 posting from another male who said, "Make it easy . . . GUILTY!" However, again, this betrays the ignorance of the responders about what was going on in the trial and suggests that the foreperson *was not*, rather than that she was, communicating with them about the trial. We also note that the foreperson's childhood friend's response that the foreperson's service was a horrid experience followed the foreperson's daughter's friend calling it an ordeal and another responder calling it a "[h]ard job." The same is true of other responses that were solicitous of the foreperson, to which defendant now calls our attention.

As far as one of the June 12 responders assuming that the case did not involve a car accident or workmen's comp, this assumption could have been based on the length of the trial (by then, seven days, said the foreperson in her posting) and/or the fact that the foreperson had asked for prayers concerning her service. It did not flow necessarily, as defendant now asserts, from communication between the foreperson and this responder about the case. We also note that responder followed up her comment with, "Can't wait to hear why they kept you there so many days" which suggests she knew nothing about the case.

the toll the trial was taking on the foreperson and it would have not been unusual for the friend to contact the foreperson's daughter about her mother's welfare.  Having here and previously responded to every evidentiary point raised by defendant in his brief suggesting that the foreperson's denial that she discussed the case with others or read the responses during the trial was unworthy of belief by the court below, we conclude that the trial court's credibility determination and findings of facts were supported by substantial evidence.  By parity of reason, we reject defendant's assertion that the court below "must have" applied an incorrect standard in finding there was no misconduct.

Defendant puts the cart before the horse when he argues that the trial court's ruling "failed to appreciate the presumption of prejudice inherent in juror misconduct."  *First*, the trial court must *find misconduct*, *then* the rebuttable presumption of prejudice arises. (*In re Carpenter* (1995) 9 Cal.4th 634, 657 ["Although prejudice is presumed *once misconduct has been established*, the initial burden is on defendant to prove misconduct." (Italics added.)]; *People v. Cissna* (2010) 182 Cal.App.4th 1105, 1116 ["*When the record shows there was juror misconduct*, the defendant is afforded the benefit of a rebuttable presumption of prejudice."  (Italics added.)].)  By finding there was no misconduct, *there was no* presumption of prejudice for the trial court to apply.  Whether the facts, as found by the court below, constitute misconduct is a legal question which we review independently (*People v. Collins* (2010) 49 Cal.4th 175, 242), however, defendant's issue here with the trial court's ruling is based on his dispute with that court's *factual findings*, not with whether the facts, as the trial court found them to be, constituted misconduct.

34

Those of us who have lived long enough have learned that people make assumptions—when jury duty is mentioned in social circles, it is often assumed, or at least hoped, that the case is a criminal case, because civil cases are usually far less worthy of discussion by lay people. It is difficult for anyone, lay person or lawyer, to imagine a juror getting emotionally worked up over a civil case unless the facts were extraordinary. It is fairly clear that's what happened here—the foreperson's Facebook friends made assumptions about the case she was sitting on, perhaps because of its length and/or her apparent frustration/difficulty with having to serve on the jury. They also sympathized with her plight at having to sit on such a difficult case. While much can *speculatively* be read into what they said, and defendant does a thorough job of this here, as the trial court observed, absent some *evidence* that the foreperson either communicated with any of them or made up her mind based on anything other than what was presented at trial, defendant did not carry his burden of proof below.

4. *Equal Protection Challenge to the Sexually Violent Predator Law*

In *People v. McKee* (2010) 47 Cal.4th 1172, 1208, 1210, the California Supreme Court gave the People the opportunity to show that sexually violent predators as a class bore a substantially greater risk to society, which supports, against an equal protection challenge, treating them differently from mentally disordered offenders and those found not guilty by reason of insanity in terms of the indeterminate term imposed and the burden of proof by a preponderance which the former bears in seeking release. In *People v. McKee* (2012) 207 Cal.App.4th 1325, 1330, 1331, Division One of this court

35

concluded that the trial court had properly found that the People had presented substantial medical and scientific evidence, under the strict scrutiny standard, to support a reasonable perception by the electorate, who imposed the indeterminate term and the burden of proof, that sexually violent predators presented a substantially greater danger to society than mentally disordered offenders or those not guilty by reason of insanity. The California Supreme Court denied review in that case. Contrary to defendant's current suggestion, Division One's conclusion was not specific to the defendant in that case, but to *the class* of sexually violent predators. (*People v. McDonald* (2013) 214 Cal.App.4th 1367, 1378; *People v. McKnight* (2012) 212 Cal.App.4th 860, 863, 864.) We agree with and adopt the reasoning and holding of *McKee*, necessarily rejecting defendant's arguments that *McKee* was wrongly decided. We note that other appellate courts have also reached the same conclusion and our research has revealed none concluding otherwise. (*People v. McDonald*, *supra*, 214 Cal.App.4th at p. 1372; *People v. Landau* (2013) 214 Cal.App.4th 1, 47; *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1086; *People v. McKnight*, *supra*, 212 Cal. App.4th at p. 862.) Defendant's assertion here that he has a due process right to relitigate the issue determined by Division One was rejected in *People v. McDonald*, *supra*, 214 Cal.App.4th at pages 1377, 1378 and we adopt its reasoning.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

36

RAMIREZ
P. J.

We concur:

McKINSTER
J.

CODRINGTON
J.